# Illinois Official Reports

## Appellate Court

---

**Underwood v. City of Chicago, 2020 IL App (1st) 182180**

---

| | |
|---|---|
| Appellate Court Caption | MICHAEL W. UNDERWOOD, JOSEPH M. VUICH, RAYMOND SCACCHITTI, ROBERT McNULTY, JOHN E. DORN, WILLIAM J. SELKE, JANIECE R. ARCHER, DENNIS MUSHOL, RICHARD AGUINAGA, JAMES SANDOW, CATHERINE A. SANDOW, MARIE JOHNSTON, and 338 OTHER NAMED PLAINTIFFS LISTED IN EXHIBIT 23, Plaintiffs-Appellants, v. THE CITY OF CHICAGO, a Municipal Corporation; TRUSTEES OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF CHICAGO; TRUSTEES OF THE FIREMEN'S ANNUITY AND BENEFIT FUND OF CHICAGO; TRUSTEES OF THE MUNICIPAL EMPLOYEES' ANNUITY AND BENEFIT FUND OF CHICAGO; and TRUSTEES OF THE LABORERS' AND RETIREMENT BOARD EMPLOYEES' ANNUITY AND BENEFIT FUND OF CHICAGO, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>No. 1-18-2180 |
| Filed<br>Rehearing denied | June 30, 2020<br>August 14, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CH-17450; the Hon. Neil H. Cohen, Judge, presiding. |
| Judgment | Certified questions answered. Orders vacated in part; cause remanded. |

| | |
|---|---|
| Counsel on Appeal | Clinton A. Krislov and Kenneth T. Goldstein, of Krislov & Associates, Ltd., of Chicago, for appellants. |
| | Mark A. Flessner, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Sara K. Hornstra, Assistant Corporation Counsel, of counsel), for appellee City of Chicago. |
| | Cary E. Donham, Graham C. Grady, John F. Kennedy, and Richard Hu, of Taft Stettinius & Hollister LLP, of Chicago, for appellee Trustees of the Laborers' and Retirement Board Employees' Annuity and Benefit Fund of Chicago. |
| | Edward J. Burke, Mary Patricia Burns, Vincent D. Pinelli, and Sarah A. Boeckman, of Burke Burns & Pinelli, Ltd., of Chicago, for appellees The Trustees of the Firemen's Annuity and Benefit Fund of Chicago and the Trustees of the Municipal Employees' Annuity and Benefit Fund of Chicago. |
| | Justin B. Kugler, of Chicago, for other appellee. |
| Panel | PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion. Justices Cunningham and Connors concurred in the judgment and opinion. |

## OPINION

¶ 1   In this latest installment of decades-long pension litigation, plaintiffs claim that each of the defendant funds has an obligation, set out in the 1983 and 1985 amendments to the Illinois Pension Code (40 ILCS 5/1-101 *et seq.* (West 2018)) and protected by our constitution's pension protection clause, to select and establish a healthcare plan for its annuitants to participate in. The circuit court denied plaintiffs' motion to compel on the basis that the existence of such a duty was incompatible with our decision in *Underwood v. City of Chicago*, 2017 IL App (1st) 162356 (*Underwood II*). For the reasons that follow, we agree with plaintiffs that this issue was not decided in *Underwood II* and its consideration by the circuit court is thus not barred by the law-of-the-case doctrine.

¶ 2   We also agree with plaintiffs that, for purposes of establishing eligibility for fixed-rate healthcare subsidies provided by the 1983 and 1985 amendments, the "execution date" of the 2003 class-action settlement agreement finally resolving related pension litigation was not the date the agreement was signed but the date, after having been approved by the circuit court, that it became an enforceable provision of the Pension Code.

¶ 3    Although plaintiffs purport to bring this interlocutory appeal pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), which governs appeals from final orders disposing of one or more but fewer than all of the parties or claims in a case, it is clear to us that both the parties and the circuit court intended for the appeal to be narrowly confined to these two discreet issues. Properly viewed, the appeal is not one challenging a partial judgment but rather one seeking answers to certified questions under Illinois Supreme Court Rule 308 (eff. July 1, 2017). Having exercised our discretion to hear the appeal on this basis and now having answered the questions, we vacate those portions of the circuit court's orders to the contrary and remand for further proceedings consistent with this opinion.

¶ 4                                      I. BACKGROUND

¶ 5    The lengthy history of this litigation has been summarized numerous times, most recently in this court's June 29, 2017, opinion affirming in part and reversing in part the circuit court's dismissal of most of plaintiffs' claims. *Underwood II*, 2017 IL App (1st) 162356. We repeat here only those facts necessary for consideration of the present appeal.

¶ 6                        A. The 1983 and 1985 Pension Code Amendments

¶ 7    The City of Chicago (City) has historically provided its retirees with fixed-rate healthcare subsidies funded by city taxes. The City agreed to provide such subsidies to retired Chicago police officers and firefighters in 1983, and the Pension Code was amended to include these subsidies (see Pub. Act 82-1044, § 1 (eff. Jan. 12, 1983) (adding Ill. Rev. Stat. 1983, ch. 108½, ¶ 6-164.2, codified as amended at 40 ILCS 5/6-164.2 (firemen), and Ill. Rev. Stat. 1983, ch. 108½, ¶ 5-167.5, codified as amended at 40 ILCS 5/5-167.5 (policemen) (providing $55 per month for non-Medicare-eligible retirees and $21 per month for Medicare-eligible retirees)) and to retired municipal employees, laborers, and retirement board employees in 1985 (see Pub. Act 84-159, § 1 (eff. Aug. 16, 1985) (adding Ill. Rev. Stat. 1985, ch. 108½, ¶ 11-160.1, codified as amended at 40 ILCS 5/11-160.1 (providing $25 per month to retired laborers)); Pub. Act 84-23, § 1 (eff. July 18, 1985) (adding Ill. Rev. Stat. 1985, ch. 108½, ¶ 8-164.1, codified as amended at 40 ILCS 5/8-164.1 (providing $25 per month to retired municipal employees))). The legislation contemplated that each of the funds established for these employees (the Policemen's Annuity and Benefit Fund of Chicago, Firemen's Annuity and Benefit Fund of Chicago, Municipal Employees' Annuity and Benefit Fund of Chicago, and Laborers' & Retirement Board Employees' Annuity & Benefit Fund of Chicago (collectively, the Funds)) would contract with an insurance carrier to provide a healthcare plan for its retirees and would use the monthly subsidies provided by the City toward the premiums for such coverage. To the extent that health insurance premiums exceeded the monthly subsidies, the excess was to be deducted from a retiree's monthly annuity unless that individual elected to terminate the coverage.

¶ 8                        B. The Korshak Litigation and Settlements

¶ 9    In 1987, the City announced that it would stop providing the subsidies beginning on January 1, 1988, and filed a lawsuit seeking a declaration that it had no legal obligation to continue doing so (*City of Chicago v. Korshak*, No. 87 CH 10134 (Cir. Ct. Cook County)) (Korshak Litigation). The Funds counterclaimed, asserting that the City was required to continue providing the subsidies.

¶ 10    Before the merits of the case were reached, however, the City and the Funds settled. The terms of the settlement, which were adopted by the legislature and made part of the Pension Code (see Pub. Act 86-273, § 1 (eff. Aug. 23, 1989) (amending Ill. Rev. Stat. 1989, ch. 108½, ¶ 5-167.5, codified as amended at 40 ILCS 5/5-167.5)), provided that the Funds would continue to subsidize retirees' healthcare premiums—at an increased amount—for an additional 10 years or through the end of 1997. The City in turn agreed to pay 50% of the cost of the retirees' healthcare coverage during this time. The settlement was an interim measure intended to give the parties time to reach a more permanent resolution of their dispute. They agreed to continue negotiating in good faith, and if they failed to reach such a resolution at the end of the 10-year period, the parties would be "restored to the same legal status which existed as of October 19, 1987," when the litigation began. The corresponding amendments to the Pension Code also made clear that these benefits were time-limited and would "terminate on December 31, 1997." See Pub. Act 86-273, § 1 (eff. Aug. 23, 1989) (amending Ill. Rev. Stat. 1989, ch. 108½, ¶ 5-167.5).

¶ 11    In 1997, but before the terms of this first settlement expired, the parties reached a second interim settlement, with similar terms, that was to last until June 30, 2003.

¶ 12    On April 4, 2003, a final settlement agreement was reached in the Korshak Litigation. The Funds agreed to make monthly premium contributions of $85 and $55 (depending on Medicare eligibility) from July 1, 2003, until June 30, 2008, with those contributions increasing to $95 and $65, respectively, from July 1, 2008, to June 30, 2013. The City agreed to pay 55% of the healthcare costs, for life, of individuals who retired on or before June 30, 2005, and lesser percentages for those who retired after that date. The agreement also provided that additional healthcare benefits not provided for in the settlement would be offered and could be terminated by the City "at its sole discretion." In a letter dated May 15, 2013, the City made clear to plaintiffs that it would continue to provide lifetime healthcare subsidies for those who retired before August 23, 1989, but that benefits for those retiring on or after that date would be phased out entirely by early 2017.

¶ 13                                    C. *Underwood II*

¶ 14    Plaintiffs in the present action are past or present City employees who alleged improper diminution of pension benefits under the Illinois Constitution, breach of contract, estoppel, impairment of contract, and denial of equal protection. These claims were brought on behalf of four subclasses: (1) those who retired before December 31, 1987 (the Korshak subclass), (2) those who retired between January 1, 1988, and August 23, 1989 (the Window subclass), (3) those who retired on or after August 23, 1989 (subclass three), and (4) those who were hired after August 23, 1989 (subclass four).

¶ 15    The City filed a motion to dismiss the claims under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2012)), and the circuit court largely granted that motion. The court concluded that plaintiffs could not state a claim for benefits based on the 1987, 1997, or 2003 amendments to the Pension Code because the settlements giving rise to those amendments were stopgap measures providing only time-limited benefits. However, the circuit court concluded that the Korshak and Window subclasses, as well as subclass three, could state a claim based on the 1983 and 1985 amendments to the Pension Code, which contained no such limitations. The circuit court denied the remaining claims, denied a renewed motion for

injective relief filed by the retirees, and found, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), that there was no just reason to delay an appeal of its rulings.

¶ 16 On appeal, this court affirmed the circuit court's ruling that the settlement agreements were temporary measures that provided only time-limited benefits and that the 1983 and 1985 amendments to the Pension Code protected the right to a fixed-rate subsidy, not a particular quantum of buying power or level of healthcare services. We reversed the circuit court's order in one respect, holding that the right to such subsidies also extended to members of subclass four, who began participating before the 2003 settlement. *Underwood II*, 2017 IL App (1st) 162356, ¶ 62.

¶ 17 D. Proceedings on Remand

¶ 18 On remand, plaintiffs filed a fourth amended complaint that the Funds moved to strike on the basis that it reasserted claims we held were properly dismissed in *Underwood II*. Plaintiffs simultaneously filed a motion to compel each of the Funds to provide its annuitants with a healthcare plan. On September 12, 2018, the circuit court struck with prejudice all but count I (for a declaration of rights protected by the pension protection clause) of the fourth amended complaint as improperly repleaded claims barred by the law-of-the-case doctrine. It determined that, to the extent plaintiffs argued in their motion to compel that the 1983 and 1985 amendments required the Funds to provide retirees with more than the fixed-rate premium subsidies funded by City taxes, that issue had also been decided in *Underwood II*. At plaintiffs' request, and citing Rule 304(a), the circuit court issued an order finding that there was no just reason to delay an appeal of that ruling.

¶ 19 Following briefing on the issue, on January 16, 2019, the circuit court also held a hearing to address plaintiffs' argument that the "execution date" of the 2003 settlement—the cutoff date for entitlement to the fixed-rate subsidies—was not a hired-by date before April 4, 2003, when the last party signed the 2003 settlement, but rather June 16, 2003, when the court overseeing the Korshak Litigation approved the settlement. The circuit court rejected this argument, concluding that the proper cutoff date was indeed April 4, 2003, and subsequently granted plaintiffs' request for a Rule 304(a) finding making that ruling also immediately appealable.

¶ 20 II. JURISDICTION AND SCOPE OF APPEAL

¶ 21 On September 28, 2018, and February 20, 2019, respectively, the circuit court made written findings that there was no just reason to delay enforcement or appeal of the two interlocutory rulings challenged in these consolidated appeals: (1) the portion of the circuit court's September 12, 2018, order denying plaintiffs' motion to compel the Funds to provide their annuitants with a healthcare plan as barred by this court's decision in *Underwood II* and (2) the circuit court's finding in its January 16, 2019, order that the eligibility cutoff for retirees entitled to receive the fixed-rate subsidies specified in the 1983 and 1985 amendments to the Pension Code is a hired-by date of April 4, 2003. Plaintiffs filed timely notices of appeal from those rulings on October 10, 2018, and February 22, 2019, and we granted a motion to consolidate the appeals on March 15, 2019.

¶ 22 Plaintiffs maintain—and no defendant has argued otherwise—that we have jurisdiction over these consolidated appeals under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), governing appeals from judgments as to fewer than all parties or claims. Rule 304(a), however,

"requires full resolution of an entire claim, separable from claims remaining before the trial court." *Davis v. Loftus*, 334 Ill. App. 3d 761, 769 (2002). Contrary to the requirements of Rule 304(a), the language the circuit court employed in its orders makes clear that it intended for us to review only two discreet issues, the resolution of which—alone or together—would not fully resolve any one claim in this case.

¶ 23    In its September 28, 2018, order, for example, the court stated:

"Plaintiffs' Motion for the Court to enter Rule 304(a) language addressing the Court's September 12, 2018 Memorandum and Order, *specifically limited to the Court's finding* that the Police, Fire, Municipal and Laborers' City of Chicago Pension Funds have no obligation to provide healthcare plans for their annuitants under the 1983 amendments to the Fire and Police Pension Fund articles and the 1985 amendments to the Laborers' and Municipal Fund articles, is granted and this Court finds that there is no just reason for delaying appeal *limited solely to that holding*." (Emphases added.)

The "finding" or "holding" referred to was the circuit court's determination that a duty on the part of each of the Funds to provide its annuitants with a healthcare plan was inconsistent with and barred by our holding in *Underwood II*.

¶ 24    The Rule 304(a) language in the court's February 20, 2019, order was similarly limited to a single issue, stating:

"The court grants Rule 304(a) findings that there is no just cause for delaying either enforcement or appeal that the 'execution date' of the 2003 settlement Agreement in City of Chicago v. Korshak intended by the Appellate Court [in *Underwood II*] is April 4, 2003."

¶ 25    Rule 308, and not Rule 304(a), provides the proper basis for an interlocutory appeal of discreet issues like these. That rule provides as follows:

"When the trial court, in making an interlocutory order not otherwise appealable, finds that the order involves a question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, the court shall so state in writing, identifying the question of law involved." Ill. S. Ct. R. 308 (eff. July 1, 2017).

¶ 26    The limited nature of this appeal did not become clear until both of these consolidated cases were fully briefed and oral argument was heard. Where it is clear that a circuit court intended to permit a party to take an appeal, not from a judgment disposing of one or more specific claims, but from a ruling on a discreet issue—and where, in our discretion, we have concluded that interlocutory appellate review of that question is proper—we have treated an appeal purportedly brought under Rule 304(a) as one more properly brought under Rule 308. See *Hutton v. Consolidated Grain & Barge Co.*, 341 Ill. App. 3d 401, 404 (2003). We find it appropriate to do so here. To do otherwise in this case would be a large waste of legal and judicial resources and would only further prolong this overly protracted litigation.

¶ 27    Plaintiffs also sought and were denied an interlocutory appeal from a third ruling—that the Korshak and Window subclasses, for whose members the City has committed to cover 55% of their healthcare plan costs for life, are not additionally entitled to the fixed-rate healthcare subsidies provided for in the 1983 and 1985 amendments to the Pension Code. Plaintiffs insist that—pursuant to our powers under Illinois Supreme Court Rule 366(a) (eff. Feb. 1, 1994)—

we may consider this issue without a Rule 304(a) finding or any other independent basis for appellate jurisdiction. We disagree.

¶ 28    Rule 366(a) provides, in relevant part, that

"[i]n all appeals the reviewing court may, in its discretion, and on such terms as it deems just,

(1) exercise all or any of the powers of amendment of the trial court;

\* \* \*

(5) enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief \*\*\* that the case may require." *Id.*

¶ 29    In support of their argument that this rule permits us to simply disregard the circuit court's decision not to grant their request for interlocutory review, plaintiffs cite *Schrock v. Shoemaker*, 159 Ill. 2d 533, 536 (1994), a case that involved a certified question under Illinois Supreme Court Rule 308 (eff. Feb. 1, 1994). In *Schrock*, our supreme court invoked its powers under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), "[i]n the interest of judicial economy and to reach an equitable result," to "go beyond the certified questions and provide a solution to all questions raised in [the] appeal." *Schrock*, 159 Ill. 2d at 537. Noting that Rule 366 also applies to the appellate court, we have, in at least one case, extended our review beyond the strict boundaries of a Rule 308 certified question. See *Billerbeck v. Caterpillar Tractor Co.*, 292 Ill. App. 3d 350, 357 (1997). Nothing in these authorities, however, persuades us that we have the power, under Rule 366 or otherwise, to disregard a circuit court's clearly articulated decision to deny a request for interlocutory review or to otherwise expand the scope of our appellate powers in this situation.

¶ 30    Whether because they recognize the weakness of their argument or because they hope that this court will not scrutinize too closely the scope of its jurisdiction in these consolidated appeals, plaintiffs make this argument not in the statement of jurisdiction required by Illinois Supreme Court Rule 341(h)(4)(i) (eff. May 25, 2018) but in a footnote near the very end of their brief. We could refuse to consider it on this basis alone, pursuant to our repeated admonition that "[s]ubstantive arguments may not be made in footnotes." *Technology Solutions Co. v. Northrop Grumman Corp.*, 356 Ill. App. 3d 380, 382 (2005). We instead consider but reject plaintiffs' argument and will address only the two issues that it is clear the circuit court intended for this court to review.

¶ 31                            III. ANALYSIS
¶ 32            A. The Funds' Obligations Under the 1983 and 1985 Amendments
¶ 33    Plaintiffs first challenge the circuit court's order denying their motion to compel as barred by this court's holding in *Underwood II*. In fact, part of plaintiffs' claim is that *Underwood II* actually decided this issue in their favor. Plaintiffs' position has been, and continues to be, that the Funds are obligated by article XIII, section 5, of the Illinois Constitution (Ill. Const. 1970, art. XIII, § 5), known as the pension protection clause, and the plain language of the 1983 and 1985 amendments to the Pension Code to "provide" a lifetime healthcare coverage plan for retired City employees to participate in.

¶ 34    The 1983 amendments for the firemen and policemen funds stated as follows:

"(b) *The Board shall contract with one or more carriers to provide group health insurance for all annuitants.* Such group health insurance shall provide for protection against the financial costs of health care expenses incurred in and out of hospital including basic hospital-surgical-medical coverages and major medical coverage. The program may include such supplemental coverages as out-patient diagnostic X-ray and laboratory expenses, prescription drugs and similar group benefits.

\* \* \*

(d) The Board shall pay the premiums for such health insurance for each annuitant with funds provided as follows:

The basic monthly premium for each annuitant shall be contributed by the city from the tax levy prescribed in [separate provisions for policemen and firemen], up to a maximum of $55 per month if the annuitant is not qualified to receive medicare benefits, or up to a maximum of $21 per month if the annuitant is qualified to receive medicare benefits.

If the basic monthly premium exceeds the maximum amount to be contributed by the city on his behalf, such excess shall be deducted by the Board from the annuitant's monthly annuity, unless the annuitant elects to terminate his coverage under this Section, which he may do at any time. The full cost of any optional coverage elected by the annuitant shall be deducted from his monthly annuity." (Emphasis added.) Pub. Act 82-1044, § 1 (eff. Jan. 12, 1983) (adding Ill. Rev. Stat. 1983, ch. 108½, ¶¶ 5-167.5, 6-164.2, codified as amended at 40 ILCS 5/5-167.5 (policemen) and 40 ILCS 5/6-164.2 (firemen)).

¶ 35 And the 1985 amendments for laborers and municipal employees funds stated as follows:

"Group Health Care Plan. Each employee annuitant in receipt of an annuity on the effective date of this Section and each employee who retires on annuity after the effective date of this Section, *may participate in a group hospital care plan and a group medical and surgical plan approved by the Board* if the employee annuitant is age 65 or over with at least 15 years of service. The Board, in conformity with its regulations, *shall pay to the organization underwriting such plan* the current monthly premiums up to the maximum amounts authorized in the following paragraph for such coverage.

As of the effective date the Board is authorized to make payments up to $25 per month for employee annuitants age 65 years or over with at least 15 years of service.

If the monthly premium for such coverage exceeds the $25 per month maximum authorization, the difference between the required monthly premiums for such coverage and such maximum may be deducted from the employee annuitant's annuity if the annuitant so elects; otherwise such coverage shall terminate.

Amounts contributed by the city as authorized under [separate provisions for laborers and municipal employees] for the benefits set forth in this Section shall be credited to the reserve for group hospital care and group medical and surgical plan benefits and all such premiums shall be charged to it.

The group hospital care plan and group medical and surgical plan established under this Section are not and shall not be construed to be pension or retirement benefits for purposes of Section 5 of Article XIII of the Illinois Constitution of 1970." (Emphases

added.) Pub. Act 84-23, § 1 (eff. July 18, 1985) (adding Ill. Rev. Stat. 1985, ch. 108½, ¶ 8-164.1, codified as amended at 40 ILCS 5/8-164.1 (municipal employees)).

See also Pub. Act 84-159, § 1 (eff. Aug. 16, 1985) (adding Ill. Rev. Stat. 1985, ch. 108½, ¶ 11-160.1, codified as amended at 40 ILCS 5/11-160.1 (laborers)).

¶ 36 Plaintiffs remind us that "to the extent there is any question as to legislative intent and the clarity of the language of a pension statute, it must be liberally construed in favor of the rights of the pensioner." (Internal quotation marks omitted.) *Kanerva v. Weems*, 2014 IL 115811, ¶ 36. Plaintiffs insist that the Funds have an ongoing obligation under the pension protection clause to provide them with a healthcare plan and that any other result would be unfair given that many of them do not qualify for federal Medicare coverage.

¶ 37 In response, the Funds argue that this court already decided in *Underwood II* that the *only* benefit any of the plaintiffs are entitled to under the pension protection clause is the monthly fixed-rate healthcare subsidies owed by the City under the 1983 and 1985 amendments. They insist that the resolution of this issue in *Underwood II* is law of the case and may not be relitigated. The circuit court, which did not at first share this understanding of our holdings in *Underwood II*, was ultimately persuaded by the Funds that the issue had been decided by us and that plaintiffs' motion to compel could not be considered.

¶ 38 The law-of-the-case doctrine provides that "where an issue has been litigated and decided, a court's unreversed decision on that question of law or fact settles that question for all subsequent stages of the suit." (Internal quotation marks omitted.) *Alwin v. Village of Wheeling*, 371 Ill. App. 3d 898, 911 (2007). "[Q]uestions decided and determined by [this court] on [a] first appeal" are thus generally "not open for re-consideration on [a] second appeal." (Internal quotation marks omitted.) *Relph v. Board of Education of DePue Unit School District No. 103*, 84 Ill. 2d 436, 443 (1981). The extent to which this doctrine applies here is an issue of law we review *de novo*. *In re Christopher K.*, 217 Ill. 2d 348, 364 (2005).

¶ 39 We acknowledge that there is language in *Underwood II* that might suggest that we answered this question in favor of the Funds. However, when that language is examined in the context of what was before us, it is clear to us that we in fact did not address this issue. It is also clear to us that we did not answer this question in plaintiffs' favor.

¶ 40 To understand the scope of this court's holdings in *Underwood II*, we begin by looking at the nature of plaintiffs' claims and the circuit court rulings preceding the dismissal orders that were before us in that appeal. Count I of plaintiffs' first amended complaint sought a declaration that any reduction in their healthcare benefits would violate the pension protection clause. That clause provides that "[m]embership in any pension or retirement system of the State *** shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5. Our supreme court has held that the clause protects not just core pension annuity payments but other benefits of membership in the State's pension systems, including specifically subsidized healthcare. *Kanerva*, 2014 IL 115811, ¶ 41.

¶ 41 In count II, plaintiffs alleged that any reduction in benefits from those they were entitled to in 1987, when the Korshak Litigation was initiated, constituted a breach of contract. And in count III, they asserted that defendants were estopped from terminating benefits or reducing them to a level below the highest level of benefits attained by plaintiffs during their participation in group healthcare benefits.

¶ 42        On December 3, 2015, the circuit court denied motions to dismiss filed by the City and the Funds as to Count 1, dismissed Count II with leave to amend (on the basis that plaintiffs had failed to attach copies of the contracts they purported to rely on), and dismissed Count III with prejudice. The court determined that although the 1989, 1997, and 2003 amendments to the Pension Code provided only temporary benefits that had expired, plaintiffs had "clearly state[d] a cause of action for declaratory relief as to the City's and the Funds' obligations under the 1983 and 1985 amendments, which, under the pension protection clause, could not be diminished. The court noted, however, that the "exact nature of those obligations [was] not properly decided on a § 2-615 motion to dismiss."

¶ 43        When asked by defendants to clarify this ruling, the court entered an additional order on March 3, 2016, stating as follows:

> "*The City is correct that it does not have any obligation under the 1983 or 1985 amendments to subsidize or provide healthcare for the Funds' annuitants. That obligation is placed on the Funds*. However, the City does have a[n] obligation to contribute, through the collection of the special tax levy, the monies used by the Funds to subsidize/provide healthcare for the Funds' annuitants. *Therefore, both the Funds and the City have certain obligations under the 1983 and 1985 amendments and both the City and the Funds are proper parties to Count I*." (Emphases added.)

¶ 44        Plaintiffs filed a third amended complaint, but the core claims they asserted were largely the same as the ones they had previously alleged. Defendants again moved to dismiss, and on July 21, 2016, the circuit court granted in part and denied in part those motions, again finding that plaintiffs had stated a claim for declaratory relief under the pension protection clause only for benefits they were entitled to under the 1983 and 1985 amendments to the Pension Code, and only if they were hired before August 23, 1989, when the first settlement was reached in the Korshak Litigation. The court ruled that plaintiffs had failed to cure any of the deficiencies underlying their breach of contract claim and rejected their substitution of a claim for promissory estoppel for the claim of equitable estoppel it had previously dismissed with prejudice. The court dismissed with prejudice plaintiffs' new claims for impairment of contract and violation of their right to equal protection under the law, as well as a claim based on their assertion that the 1989, 1997, and 2003 amendments were improper special legislation. This is the order that plaintiffs appealed in *Underwood II*.

¶ 45        In the background sections of both of its dismissal orders, the court stated that (1) the 1983 amendments "*require[d]* the Fire and Police Funds to contract with one or more insurance carriers to provide group health care coverage for their retirees" and (2) the 1985 amendments "*also directed* the [laborer and municipal employee funds] *to approve* a group health plan for [their] annuitants." (Emphases added.) Although the court noted that, unlike the 1983 amendments, the 1985 amendments "further provided that the healthcare plans were not to be construed as pension or retirement benefits under [the pension protection clause]," it found— following our supreme court's clear holding in *Kanerva*, 2014 IL 115811, ¶ 55, that healthcare benefits are protected by the pension protection clause—that this language was an unenforceable attempt to "erase the constitutional rights of the annuitants by statute."

¶ 46        In *Underwood II*, this court agreed with the circuit court that plaintiffs could not state a claim for coverage under the time-limited benefits provided for in the 1989, 1997, and 2003 settlements. We thus affirmed that part of the court's dismissal order. *Underwood II*, 2017 IL

App (1st) 162356, ¶ 29. We concluded in *Underwood II* that "we affirm all but the trial court's ruling that members of subclass four have no claim whatsoever under count I." *Id.* ¶ 66.

¶ 47    Plaintiffs rely on this conclusion and the fact that the circuit court order had noted that the Funds had an obligation to provide a plan to suggest that this issue was decided in their favor. However, unlike the granting of a motion to dismiss, the *denial* of a motion to dismiss is not a ruling that disposes of one or more parties or claims and is thus not the proper subject of an appeal under Rule 304(a). See *Jursich v. Arlington Heights Federal Savings & Loan Ass'n*, 83 Ill. App. 3d 352, 353 (1980) ("Because the denial of a motion to dismiss is interlocutory in nature rather than a final order, the only grounds for the appeal of such an order are Supreme Court Rules 307 and 308."). In *Underwood II*, we were not affirming any *denial* of a motion to dismiss because that was not before us. We were merely affirming the circuit court's other *grants* of dismissal.

¶ 48    We did go on in *Underwood II*, however, to consider the precise nature of the pension protection clause claims, under the 1983 and 1985 amendments, because we had reversed the circuit court's dismissal of these claims as to the subclass four plaintiffs and we wanted to clarify what kinds of lifetime coverage could be protected under the pension protection clause. In doing so, we unambiguously rejected plaintiffs' argument that they were entitled to "lifetime healthcare coverage":

> "The retirees contend that the pension protection clause should be considered to protect their abstract right to 'healthcare coverage.' But that is not what the Illinois Constitution provides. The pension protection clause protects a specific tangible benefit that cannot be diminished or impaired. [Citation.] It is the subsidy itself that is protected. Under count I, the pension protection clause protects the benefits in the 1983 and 1985 amendments for any retiree who began participating in the retirement system before the 2003 settlement was executed. The 1983 and 1985 amendments represent the highest level of benefits to which the retirees ever had an enduring right. For the reasons set forth in section A above, the pension protection clause entitles the retirees to nothing more." *Underwood II*, 2017 IL App (1st) 162356, ¶ 40.

It is this language that the Funds now seek to rely on as law of the case.

¶ 49    As noted above, our explanation for reaching this issue was that, as to subclass four, the circuit court had also dismissed the claims under the 1983 and 1985 amendments. As to that class, there was a full dismissal for us to consider:

> "The Funds argue that we lack jurisdiction to consider the applicability of the 1983 and 1985 amendments to the Korshak [(individuals who retired on or before December 31, 1987)], Window [(individuals who retired after December 31, 1987, but before August 23, 1989)], and subclass three [(individuals who retired on or after August 23, 1989)] subclasses. This argument is based on the fact that the trial court held that those subclasses *could* state a claim based on the 1983 and 1985 amendments and, therefore, denied that portion of the motions to dismiss. However, the claims under count I of the complaint that relate to subclass four [(individuals hired after August 23, 1989)] were dismissed in their entirety, and we have jurisdiction to review the dismissal under Rule 304(a). The Korshak and Window subclass members' claims are essentially moot as the parties have settled. So, subclass three remains, but our application of the law to the dispute between the City and subclass four necessarily touches on the rights of subclass three." (Emphasis in original.) *Id.* ¶ 46.

- 11 -

¶ 50    We went on to discuss the nature of plaintiffs' rights under the 1983 and 1985 amendments simply to make clear that our broadening of the pool of individuals entitled to whatever enduring benefits those amendments provided was not a broadening of the rights themselves and that the healthcare subsidies due to participants under the 1983 and 1985 amendments were in no way equivalent to the more generous temporary subsidies that participants were provided under the 1987, 1997, or 2003 amendments that we had found were *not* covered by the pension protection clause. Given the fact that in *Underwood II*, this court had no need to consider whether the Funds had any obligation under the 1983 or 1985 amendments and that our focus was on the limited nature of the fixed subsidies, we are not inclined to find that the law-of-the-case doctrine applies to foreclose consideration of this issue. Whether the pension protection clause binds the Funds to create or approve a healthcare plan and administer it for the retirees' benefit is a question for which there seems to be no clear precedent and no clear answer. It is not the sort of issue that this court would reach unnecessarily or decide without a thorough analysis. To foreclose proper consideration of this issue would be an improper use of the law-of-the-case doctrine. See *People v. Patterson*, 154 Ill. 2d 414, 468-69 (1992) (noting that the doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided" but "is not a limit on their power"); *Reich v. Gendreau*, 308 Ill. App. 3d 825, 829 (1999) (noting that the doctrine "encompasses a court's *explicit decisions* and issues decided by *necessary implication*" (emphases added)). The circuit court in this case is not barred by the law-of-the-case doctrine from considering whether each of the Funds has an obligation to provide its annuitants with a healthcare plan or from articulating the nature of such an obligation.

¶ 51    This is the view that the parties and the circuit court seemed to have initially shared. A week after the decision was filed the parties were back before the circuit court. At that time no one seemed to understand *Underwood II* as having held that the Funds did not have a duty to provide their annuitants with a healthcare plan:

"MR. KRISLOV [(PLAINTIFFS' COUNSEL)]: Thank you, [Y]our Honor.

And just so they don't accuse me of raising things out of—I want to know based on both your ruling and Justice Simon's rulings [in *Underwood II*]: A, what the Funds are doing to set up a plan because under both your ruling and Justice Simon's ruling, the Funds have primary responsibility to provide a plan and I want them to report on what they're doing to provide a plan for their participants.

THE COURT: Yes, But Justice Simon's opinion sent it back to me to work with all of you to arrange for that. ***

* * *

*** I charge each one of the attorneys for each of the Funds to look and see what your obligations are under each of the several statutes and come up with the plans which fulfills [*sic*] your obligations and start talking about it and how you're going to do it. That's what Justice Simon said ***.

So I think there's good reason to believe that that's exactly, whatever happens, how it's going to end up one way or another. So I would suggest strongly that you start doing that and come up with some ideas for me. They've charged me with being sort of like a magistrate judge in this thing too. I have not used the word receiver on purpose when it comes to the City. And I'm going to do it, and you know I'm going to take it

- 12 -

seriously. So do it. That's not a suggestion. It's an order. Start coming up with concrete plans."

¶ 52    Plaintiffs argue that at some point the Funds "disingenuously commandeered" the language of *Underwood II* to their own benefit, convincing the circuit court that its long-held belief that the Funds were obligated under the 1983 and 1985 amendments to provide their annuitants with a healthcare plan to participate in was incompatible with this court's holdings in *Underwood II*. Whatever may have happened to change the mind of the circuit court judge, we disagree that this court intended to foreclose his consideration of this issue.

¶ 53    What, then, is the import of our decision in *Underwood II*? It is absolutely law of the case that the plaintiffs have no right to receive—and that neither the City nor the Funds have any obligation to provide—any additional monetary contributions or to guarantee affordable healthcare. The circuit court did not decide what obligation, if any, the Funds might still have—except to say that consideration of the issue was barred by the law-of-the-case doctrine. Having concluded that it was not, we remand for consideration of the merits of that issue. We decline to consider plaintiffs' merit-based arguments under various legal and equitable theories. The circuit court is in the best position to consider those arguments in the first instance.

¶ 54                    B. The Eligibility Cutoff for the Fixed-Rate Subsidies

¶ 55    In *Underwood II*, this court held that the pension protection clause locked in the 1983 and 1985 fixed-rate subsidies for any employees who were hired "by the time the 2003 settlement was executed." *Underwood II*, 2017 IL App (1st) 162356, ¶ 61. As we explained, when the time-limited benefits provided for in the two previous settlement agreements expired, plaintiffs' rights were restored to what they had been before the 1987 litigation began. *Id.* ¶¶ 33-34. The 2003 settlement, however, was different. Through it, annuitants were put on notice for the first time that when the temporary benefits provided for in *that* settlement expired, "the City would have the unilateral authority to end the program entirely." *Id.* ¶ 35. We thus held that individuals who began participating in the City's retirement system "before the 2003 settlement *was executed*" (emphasis added) are entitled to the fixed-rate subsidies provided for by the 1983 and 1985 amendments.

¶ 56    On remand, the circuit court determined that the 2003 settlement agreement was executed on April 4, 2003, based on its view that the word "execution," as "used in the normal, ordinary course of business in the law *** is the date of final signature of the last party." As even Black's Law Dictionary recognizes, however, "[t]he term 'executed' is a slippery word" that often requires explanation. (Internal quotation marks omitted.) Black's Law Dictionary (11th ed. 2019) (quoting William R. Anson, Principles of the Law of Contract, at 26 n.* (Arthur L. Corbin ed., 3d Am. ed. 1919)). Dictionary definitions of "execute" include "to carry out fully" and "put completely into effect." Merriam-Webster Online Dictionary, https://merriam-webster.com/dictionary/execute (last visited June 23, 2020) [https://perma.cc/76NE-7S5D].

¶ 57    Plaintiffs challenge the circuit court's definition of the "execution" date. They point out that the case that was settled was a class action and that while other agreements are enforceable upon mere signing, a class action settlement is not truly executed—in the sense that everything necessary to make it effective has occurred—until it receives court approval. See 735 ILCS 2-806 (West 2016) ("Any action brought as a class action under Section 2-801 of this Act shall not be compromised or dismissed except with the approval of the court and, unless excused for

good cause shown, upon notice as the court may direct."). In the Korshak Litigation, that did not happen until June 16, 2003.

¶ 58　　In addition, the 2003 settlement was not truly effective until there was an amendment making it part of the Pension Code. This happened a couple of weeks later, on July 1, 2003. See Pub. Act 93-42, § 5 (eff. July 1, 2003) (amending 40 ILCS 5/5-167.5).

¶ 59　　We agree with plaintiffs that the April 4, 2003, date is not correct. Rather, the 2003 agreement was not "executed" until July 1, 2003, and the right to benefits under the 1983 and 1985 amendments thus extends to anyone hired on or before June 30, 2003. July 1, 2003, is the date that is most consistent with our reference in *Underwood II* to an "execution" date and to references made elsewhere in that opinion to the date the 2003 settlement "went into effect" or "became operative." See *Underwood II*, 2017 IL App (1st) 162356, ¶¶ 48, 62.

¶ 60　　We reject plaintiffs' alternative argument that because the 2003 settlement agreement defines a class of "all current and former City employees who will become one of the Funds' Future Annuitants on or before June 30, 2013," anyone hired on or before June 30, 2013 (or even before December 31, 2016, the date through which the settlement was ultimately extended), is entitled to the statutory fixed-rate subsidies. As we made clear in *Underwood II*, the loss of any entitlement to the subsidies was triggered by the City's intent, made manifest in the 2003 settlement agreement, to ultimately end its obligation to provide healthcare benefits to retirees. Plaintiffs have offered no coherent argument for why the terms of that contract require a different result. Moreover, any date based on such an argument could not fairly be said to be the "execution date" of the 2003 settlement agreement, and it is law-of-the-case that the "execution date" of the 2003 agreement is the cutoff date for any entitlement to the statutory fixed-rate subsidies.

¶ 61　　　　　　　　　　　　　　　IV. CONCLUSION

¶ 62　　Having treated these consolidated appeals as ones properly brought under Rule 308, we answer the certified questions as follows: (1) plaintiffs' motion to compel each of the Funds to provide its annuitants with a healthcare plan was not barred by this court's decision in *Underwood II* and (2) the eligibility cutoff for City employees entitled to receive the fixed-rate subsidies is June 30, 2003, the last day before the terms of the court-approved 2003 settlement were incorporated by legislative amendment into the Pension Code. We vacate those portions of the circuit court's September 12, 2018, and January 16, 2019, orders to the contrary and remand this case to the circuit court for further proceedings consistent with this decision.

¶ 63　　Certified questions answered. Orders vacated in part; cause remanded.